Filed 11/23/22  In re Valerie R. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re VALERIE R., a Person Coming Under the Juvenile Court Law. | B320739 (Los Angeles County Super. Ct. No. 19CCJP05652A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. JONATHAN R., Defendant and Appellant. | |

APPEAL from the order of the Superior Court of Los Angeles County, Lisa A. Brackelmanns, Judge Pro Tempore. Affirmed.

Ernesto Paz Rey, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, Acting County Counsel, Kim Nemoy, Assistant County Counsel, and Peter Ferrera, Deputy County Counsel, for Plaintiff and Respondent.

\* \* \* \* \* \*

Jonathan R. (father) challenges the juvenile court's order terminating his parental rights over his daughter Valerie R., claiming that the court relied on an improper factor in rejecting his request to apply the beneficial parent-child relationship exception (Welf. & Inst. Code, § 366.26, subd. (c)(1)(B)(i)).[1]  We conclude there was no error, and affirm.

## FACTS AND PROCEDURAL BACKGROUND

### I.     Facts

Valerie was born in 2012 to Jasmine G. (mother) and father.

In 2013, father dragged mother outside of the family house, inflicted red marks on her face, and threatened to kill mother and take Valerie away from her; Valerie, then a toddler, was present for the incident.  The juvenile court exerted dependency jurisdiction over Valerie and, in 2015, terminated jurisdiction

---

[1]     All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

with an order placing Valerie in mother's sole physical and legal custody.

In 2016, the juvenile court again exerted dependency jurisdiction over Valerie due to mother's inability to provide care for Valerie when the father of Valerie's half siblings was using drugs in Valerie's presence. In February 2019, the juvenile court terminated jurisdiction with an order placing Valerie in father's sole physical and legal custody.

On August 26, 2019, father became upset with Valerie because she was eating too slowly and struck her with an open hand twice on the mouth and once on her arm. The blows cut her upper lip and bruised her arm. Father admitted that he would sometimes use physical discipline, but denied that he struck her on this occasion. Father was convicted of battery for the incident, and placed on three years of summary probation.

## II. Procedural Background

On August 30, 2019, the Los Angeles Department of Children and Family Services (the Department) filed a petition asking the juvenile court to exert dependency jurisdiction over Valerie. As amended, the petition alleged that father's "inappropriate physical discipline caused" Valerie "unreasonable pain" and placed her at substantial "risk" of serious physical harm, thereby rendering jurisdiction appropriate under subdivision (b)(1) of section 300.

Immediately after the petition was filed, the juvenile court detained Valerie from father and placed her with a foster parent.[2] Two months later, in October 2019, the juvenile court placed her with the paternal aunt and uncle.

---

[2] The court also detained—and later removed—Valerie from mother's custody. However, mother is not a party to this appeal.

3

Prior to the adjudication of the petition, father was deported to El Salvador. However, he kept in contact with Valerie on video chat or called her every day. Valerie had a "strong bond" with father.

The juvenile court held the dispositional hearing in mid-October 2020, and sustained the amended petition.

In late October 2020, father attempted to illegally reenter the United States from Mexico, and was arrested and placed in federal custody. He ended up pleading to a federal charge of illegal reentry and was sentenced to 21 months in federal custody, to be followed by deportation back to El Salvador.

In December 2020, the juvenile court held the dispositional hearing and removed Valerie from father's custody. The court ordered the Department to provide father with reunification services, and ordered father—as part of a case plan of those services—to complete an anger management course, to attend individual counseling to address case issues, and to attend a parenting class. The court also allowed for monitored visitation.

Although father's incarceration prevented him from completing any of the programs making up his case plan, he wrote Valerie letters and called her on an almost daily basis.

At the six-month status review hearing held in July 2021, the juvenile court terminated reunification services and ordered the matter set for a permanency planning hearing.

Over the next year, father continued to contact Valerie on a near daily basis and to send money. By that time, Valerie had been living with the paternal aunt and uncle for nearly three years (since October 2019) and had developed a "strong and loving bond" with them. Valerie indicated a desire to live with

them and be adopted by them, and they expressed their desire to adopt Valerie.

In April 2022, father was released from federal custody and deported to El Salvador. The likelihood of father lawfully reentering the country was slim.

The juvenile court held the permanency planning meeting on May 24, 2022. Father urged the court to place Valerie in a legal guardianship rather than terminate his parental rights due to the parent-child bond he has with Valerie. Both Valerie's attorney and the Department urged the court to terminate father's parental rights. Valerie's attorney conceded that father and Valerie shared a "parental bond," but urged that this bond was "overcome" by her interest in being adopted by her paternal aunt and uncle. Valerie's attorney also noted that Valerie knows that her aunt and uncle would "allow her to maintain connection with her father." The Department made a similar argument regarding the inapplicability of the beneficial parent-child relationship exception, but specifically "ask[ed] the court not to consider the fact that the paternal aunt is willing to continue [Valerie's] relationship [with father by allowing continued visitation]" because "under the law, the court has to assume that the relationship is terminated regardless of the caregiver's intentions." The court found that the beneficial child-parent exception did not apply. The court acknowledged that "father has been making routine regular phone calls to Valerie," that she "seems to love him," and that "they do have a positive relationship," but "question[ed]" "whether [that relationship is] so substantial that it would outweigh any of the benefits of Valerie having the permanency and stability in the home that she's lived in since 2019." Given Valerie's "understand[ing]" of adoption and

her desire to remain with her paternal aunt and uncle, as well as the "trauma" Valerie "has gone through . . . in being moved to different homes based on the dependency history of the parents," the court found that "any benefit accruing to the child from [her] relationship [with father] is outweighed by the physical and emotional benefit [she] will receive through permanency and stability of adoption." The court then ordered father's parental rights terminated.

Father filed this timely appeal.

## DISCUSSION

Father argues that he is entitled to a new permanency planning hearing. Specifically, he argues that (1) Valerie's attorney mentioned that the paternal aunt and uncle would allow Valerie to continue visiting father after adoption, (2) this is an improper factor to consider when examining the beneficial parent-child relationship exception, and (3) the court's ruling thus "[s]eemingly" relies on an improper factor, thereby entitling father to automatic reversal. Because this argument inverts the usual rules of appellate review, we reject it.

Once a juvenile court has terminated reunification services or a parent is deemed ineligible for them at the outset, the court "shall terminate parental rights" if it finds, "'by clear and convincing evidence,'" "that it is likely the child will be adopted" within a reasonable time. (§ 366.26, subds. (a) & (c)(1); *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 249-250.) Thus, a juvenile court must terminate parental rights and order adoption unless the parent opposing termination proves that one of six statutory exceptions applies. (§ 366.26, subd. (c)(1) & (c)(1)(B); *In re I.W.* (2009) 180 Cal.App.4th 1517, 1527, disapproved on other

6

grounds as stated in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7).

One of the six exceptions is the beneficial parent-child relationship exception. Because this exception "applies in situations where a child cannot be in a parent's custody but where severing the child's relationship with the parent, even when balanced against the benefits of a new adopted home, would be harmful for the child," a court will find the exception applicable only if the parent "establish[es]" "(1) regular visitation and contact, and (2) a relationship, the continuation of which would benefit the child such that (3) the termination of parental rights would be detrimental to the child." (*In re Caden C.* (2021) 11 Cal.5th 614, 630, 631, 635 (*Caden C.*), italics omitted.) In assessing whether the parent has engaged in regular visitation and contact, a court looks to how the parent's actual visits measure up against the extent of visitation permitted by the juvenile court's orders (*id.* at pp. 632, 636); to satisfy this element, contact must be consistent; "sporadic" visits, or visitation with "significant lapses," are not enough. (*In re A.G.* (2020) 58 Cal.App.5th 973, 994-995; *In re I.R.* (2014) 226 Cal.App.4th 201, 212.) In assessing whether the child would benefit from a continued relationship with the parent, the parent must show "that the child has a substantial, positive, emotional attachment to the parent" in light of several factors, such as the "'[(1)] [t]he age of the child, [(2)] the portion of the child's life spent in the parent's custody, [(3)] the "positive" or "negative" effect of the interaction between parent and child, and [(4)] the child's particular needs.'" *(Caden C.*, at pp. 632, 636, quoting *In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.) In assessing whether the termination of parental rights would be detrimental

7

to the child "when balanced against the countervailing benefit of a new, adoptive home," a court is to examine "how the child would be affected by losing the parental relationship" entirely. (*Caden C.*, at pp. 633, 636-637.) This is necessarily a "subtle, case-specific inquiry." (*Ibid*.) We review a juvenile court's findings regarding the first two elements (visitation and relationship) for substantial evidence, and its ruling regarding the third element (balancing of detriment versus benefit) for an abuse of discretion. (*Id.* at pp. 639-641.)

Father does not attack the juvenile court's discretionary decision not to apply the exception. Instead, he argues that the court relied upon an impermissible factor. Father is correct that a court's reliance on an "impermissible factor" is an error of law that also constitutes an abuse of discretion. (*People v. Patterson* (2017) 2 Cal.5th 885, 894.) Father is also correct that it is an error of law for a juvenile court—when considering whether to apply the beneficial parent-child relationship exception—to give any weight to "an unenforceable promise of future visitation by the child's prospective adoptive parents." (*In re S.B.* (2008) 164 Cal.App.4th 289, 300 (*S.B.*); *In re C.B.* (2010) 190 Cal.App.4th 102, 127-129 (*C.B.*).) But father is *incorrect* that we should presume—by virtue of the fact that Valerie's attorney mentioned this impermissible factor—that the juvenile court factored it into its analysis.[3] Indeed, the law is 180 degrees to the contrary. Courts are presumed to "'know[] and appl[y] the correct statutory

---

[3] For the same reason, father is incorrect that we must reverse because it "cannot be determined . . . whether the juvenile court considered factors that *Caden C.* has held are forbidden." Courts are not required to list, in every case, all of the impermissible things they did *not* consider.

and case law'" absent "evidence to the contrary" (*People v. Thomas* (2011) 52 Cal.4th 336, 361), and here there was none: Unlike the courts in *S.B.* and *C.B.*, the juvenile court in this case did not indicate it relied in any way on the fact that the paternal aunt and uncle were open to allowing father continued access to Valerie.  Father is asking us to infer that the court did so from its silence on this factor, but that flips the usual presumption on its head into a presumption that courts improperly apply the law. What is more, this is a particularly inapt case in which to invert the presumption because another of the parties explicitly pointed out that "the law" precludes reliance on the impermissible factor. If we were to accept father's argument, we would have to reverse in a case where one party suggested, "Hey, judge, you should decide whether to apply this exception by using this Magic Eight Ball" unless and until the court responded, "No, I prefer to use the law rather than a Magic Eight Ball."  Blessedly, the law does not countenance such a silly result.  Accordingly, neither do we.

**DISPOSITION**

The order is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
HOFFSTADT

We concur:


_____, P. J.
LUI


_____, J.*
BENKE

---

*       Retired Associate Justice of the Court of Appeal, Fourth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.